IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs April 26, 2017

## JAMES MELLON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 89777      Robert R. McGee, Judge**

### No. E2016-02040-CCA-R3-PC

The Petitioner, James Mellon, appeals as of right from the denial of his petition for post-conviction relief. On appeal, the Petitioner contends that he received ineffective assistance of counsel because trial counsel failed to present a viable defense. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Jonathan S. Wood, Knoxville, Tennessee, for the appellant, James Mellon.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Charme P. Allen, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

This case arises from the following procedural history. The appellant pled guilty to the first degree murder and especially aggravated robbery of Robert Scott Loveday. The State had agreed to recommend concurrent sentences of life and twenty-five years in confinement in exchange for the appellant's guilty pleas and agreeing to testify against his co-defendants. However, the appellant failed to testify against his co-defendants, and the State withdrew its sentencing recommendation. The appellant was sentenced to death for the murder conviction and twenty-five years confinement for the robbery conviction. A panel of this court affirmed the convictions and sentences; however, our supreme court

reversed his convictions, concluding that the appellant had not pled guilty voluntarily and intelligently. State v. James A. Mellon, No. E2006-00791-CCA-R3-CD, 2007 WL 1319370, at *1 (Tenn. Crim. App. May 7, 2007), perm. app. denied (Tenn. Sept. 24, 2007).

On direct appeal, this court summarized the facts of the underlying case as follows:

[O]n the night of August 23, 1997, David Jones picked up the twenty-one-year-old [Petitioner]; fourteen-year-old Ernest Rogers; and Anthony "T-Bone" Jones, who was unrelated to David Jones. The group planned to rob the "dope man" and drove to a drug house in Knoxville but found it empty. In the early morning hours of August 24, 1997, David Jones drove the group to west Knoxville. They were searching for a person to rob and spotted the victim near a gas station payphone. The victim had just paged a friend, was sitting in his Chevrolet Camaro with the driver's door open, and was waiting for the friend to call him at the payphone. David Jones pulled up behind the victim's car, and the [Petitioner] and Ernest Rogers got out and approached the victim's Camaro.

The [Petitioner] pointed a nine millimeter pistol at the victim, and the victim began pulling items out of his pockets. Anthony Jones, who had been waiting impatiently in David Jones' car, got out and ran up to the victim's car. David Jones heard gunshots and saw the [Petitioner] bend down. Anthony Jones, Ernest Rogers, and the [Petitioner] ran back to David Jones' car, and the group drove away. Soon after the shooting, a motorist waiting at a stoplight across the street from the gas station saw the victim and pulled into the gas station parking lot. He found the victim sitting on the ground and gasping for air. The motorist opened the victim's shirt, saw that he had been shot, and telephoned 911. A police investigation resulted in the arrests of the four individuals, and the police found nine millimeter handguns at Anthony Jones' and Ernest Rogers' homes. Forensic analysis of two cartridge cases recovered from the crime scene and two bullets recovered from the victim showed that the casings and bullets were fired from the handgun police found in Anthony Jones' home. In interviews with police on August 25 and 26, 1997, the [Petitioner] admitted participating in the robbery but said he never intended for the victim to be killed.

A forensic pathologist who performed the victim's autopsy testified that the victim was shot once in the left chest through the heart and once in the upper left arm. He stated that either of the wounds would have been

fatal but that the victim could have survived briefly. The robbers obtained only a watch and a one-dollar-bill from the victim.

Mellon, 2007 WL 1319370, at *1-2.

A Knox County Criminal Court jury convicted the Petitioner of first degree felony murder and especially aggravated robbery. The Petitioner was sentenced consecutively to life in prison and twenty-three years. On direct appeal, a panel of this court affirmed his convictions. Mellon, 2007 WL 1319370, at *8-11. The Petitioner timely filed a pro se petition for post-conviction relief from the judgments. Upon appointment of counsel, the Petitioner filed an amended petition.

At the Petitioner's post-conviction hearing, the following proof was presented. The Petitioner's trial counsel testified that she knew the Petitioner because she was appointed to represent him in "early 2000" for a "homicide that happened in 1998." She explained that the Petitioner was represented by two other attorneys for his original guilty plea for which he received the death penalty; however, that conviction was appealed, and "there was a reversal of the death sentence." She explained that at that point, she was appointed to represent him. Trial counsel testified that when she first received the Petitioner's case, "he still had the death notice" but that it was "ultimately withdrawn and replaced by a life without parole notice." She said that

> there was an understanding by the State that since . . . one of the other participants in the crime, one of the individuals who actually pulled the trigger and killed Mr. Loveday, that individual resolved his case with a plea to a life sentence. So I think there was an acknowledgement after the Appellate Court ruling that there was a proportionality problem, and so, ultimately, they withdrew their death notice. But there was some . . . work done on that, yes.

She explained that moving forward with the Petitioner's case, "there was a potential of life without parole and, of course, there was also a potential for consecutive sentencing for the other events of especially aggravated robbery, since the victim died at the scene."

Trial counsel also testified that some investigation had already been completed when she took over the Petitioner's case, but she still "retained the services of a private investigator." She explained that she had an investigation done on "the factual issues of guilt or innocence" and "on the mitigation" evidence to be used during the sentencing phase. Regarding her investigation concerning guilt or innocence, trial counsel said that she "did quite a bit of work." Trial counsel testified that she "filed new Brady motions and looked for possible alternate suspects and [she] looked at the case with fresh eyes[.]"

-3-

She also filed "a motion for a bill of particulars" and agreed that this was what "led . . . to the State agreeing to drop the death penalty and to just pursue life without parole." She confirmed that she filed "numerous pretrial motions" and provided the Petitioner with "copies" of those motions and that she "met with him regularly" to discuss his case. She explained that her investigator met with him and that she "also got funding for a psychologist who did a thorough neuropsychological evaluation."

Trial counsel also testified that she interviewed multiple witnesses. When asked if she interviewed the witnesses listed on the indictment, she responded,

> Yes. The investigator and sometimes the investigator and I both would investigate as many of the witnesses as we could locate. I recall that we went over to . . . the Fort Pillow Prison over at Henning and spoke with Mr. Edward Beeler, who was a pretty critical witness in this case.

Trial counsel testified that her investigator also attempted to speak with Mr. Beeler's girlfriend, to no avail.

The State asked her if her investigator spoke with any of the other individuals charged in this case and she said that she "believed that David Jones had counsel" and she did not recall specifically speaking to him. Trial counsel testified that "another one of the defendants [Anthony Jones, the shooter in the case] was serving . . . a sentence." She said that the investigator also attempted to interview Ernest Rogers, another one of the defendants in the case, but was unsuccessful.

Trial counsel testified that she did not recall the State making any plea offer before the trial. The Petitioner had already entered into a plea once, which was revoked. Moreover, she said that the victim's family members were "very engaged" and "were at every hearing," and she did not believe that "they would have approved" of any plea agreement. Trial counsel stated, "This [was] just a case that had to be tried."

Trial counsel testified that she "met with [the Petitioner] on a regular basis" and discussed "the evidence that was turned over to [her] by the State[.]" Trial counsel also testified that she discussed defense strategies with the Petitioner. When asked if she recalled her defense strategy in the Petitioner's case, trial counsel responded,

> Well, there was a proportionality issue. There was another individual involved in the crime, a young man named David Jones, who was also a participant. His activity was – is significant in the case, arguably, as [the Petitioner's] was. And he had received a plea bargain before trial. So it was my strategy to argue that . . . [the Petitioner] should not be treated more severely than Mr. Jones was.

-4-

Trial counsel affirmed that she conveyed this trial strategy to the Petitioner. When asked if she recalled "whether or not [the Petitioner] agreed with [her] about that or disagreed with [her] about that," she said, "I don't recall having many arguments with [the Petitioner]. I was able to work with him." She testified that if the Petitioner had disagreed with her on the defense strategy, then she would "would certainly [have] listen[ed] to what he would have to say, but what he'd have to say would have to have some legal merit." However, she testified that she did not "recall having an argument with [the Petitioner] about trial strategy."

The prosecutor asked trial counsel if she recalled asking the jury for "fairness and consistency" for the Petitioner during her opening and closing statements at trial. She affirmed that she remembered such and explained that "Mr. Jones, who also actively participated in this murder, had received a plea bargain[.]" She said her argument was that if "Mr. Jones' actions were not first-degree murder, then [the Petitioner's] weren't either." Trial counsel explained that "[n]either [Mr. Jones nor the Petitioner] were the ones who actually pulled the trigger and shot [the victim]. It was Mr. T-Bone who did that." She confirmed that she "specifically talked to [the Petitioner] about" a fairness and consistency defense and that he did not have any objections. Trial counsel testified that ultimately, she "was trying to get [the Petitioner] a lesser-included offense." She said that she was "trying to get him second-degree murder, if possible, or negligent homicide." Trial counsel explained that if the Petitioner had been convicted of a lesser-included offense, "he would have had a potential of a shorter sentence than life, and [the State] wouldn't have been able to seek life without parole against him[.]"

When asked if she remembered why she did not call any witnesses for the defense in this case, trial counsel responded, "Well, there might not have been any factual witnesses that would have established anything that was helpful to [the Petitioner]." Trial counsel was asked if she recalled calling any of the Petitioner's co-defendants to testify, and she replied, "No. Some of those people, . . . I know . . . David Jones resolved his with a plea, but, . . . no, I don't recall subpoenaing any of the co-defendants in this matter." She confirmed that "David Jones was a cooperating witness for the State" and that "he was the driver." With regard to the other co-defendants, she affirmed that "T-bone or Anthony Jones was the shooter[.]" Trial counsel testified that she did not call Mr. Jones to testify because she did not "believe his statement was helpful towards [the Petitioner]. [She] believe[d] he put [the Petitioner] as a participant in the robbery" and indicated that the Petitioner "knew full well that [the victim] was going to be robbed." Trial counsel said that Mr. Jones "would not support the theory that [a co-defendant] forced [the Petitioner] to be there." Trial counsel testified that she made "some effort to talk to" Ernest Rogers, another co-defendant, who was a minor at the time of the crime. Trial counsel said that she believed "the State subpoenaed [Mr. Rogers] to testify"; that

she did not "believe that he had agreed to testify"; and that the State "got in [Mr. Rogers's] prior testimony, which was very damning[.]"

Trial counsel was asked whether it was the Petitioner's decision not to testify at his trial. Trial counsel stated that "ultimately, of course, it was his decision, but I discussed it with him." She explained that testifying at trial might have been problematic for the Petitioner because "he had absolutely no remorse whatsoever and no recognition whatsoever that somebody died for absolutely no reason." Trial counsel stated, "I didn't feel that [the Petitioner] could have helped his case by getting up there and revealing [his lack of remorse] to the jury." Trial counsel said that "[h]ad [the Petitioner] insisted" that "he had wanted to testify", then she "would not have precluded him from doing so."

Regarding the Petitioner's sentence, trial counsel said that she filed "a motion seeking information on any mitigating circumstances that the State might have found" and "a motion in limine seeking to preclude the admission of any juvenile adjudications against" the Petitioner. Trial counsel also filed a motion "to compel the disclosure of any witnesses the State would seek to call at the penalty phase." Trial counsel affirmed that she "presented extensive mitigation evidence[,]" and the jury determined that the Petitioner should be given an opportunity for parole with a life sentence.[1] Trial counsel confirmed that she "performed a tremendous amount of work on" the Petitioner's case and that the evidence against the Petitioner was overwhelming.

The Petitioner said that he had spoken with trial counsel "several times over the years" and that trial counsel visited him "several times" at the jail where he was incarcerated. On those visits, the Petitioner testified that trial counsel discussed mitigation with him. He confirmed that trial counsel informed him that she had hired a private investigator to work on his case and that she planned to call expert witnesses "to deal with mitigation issues[.]" The Petitioner testified that trial counsel did not tell him that she was interviewing witness who could help him.

He stated, "I asked her to talk to several witnesses, Edward Beeler and Amanda Burnae and also, my sister, Angela Cunningham, concerning the case and they w[ere] never contacted by [trial counsel]." When asked how he believed those witnesses might have helped him, the Petitioner responded, "Because part of it was concerning Mr. Edward Beeler stating that I was bragging about the crimes, which was not true at all. And they [were] there at the time that Mr. Edward Beeler claim[ed] that I was speaking

---

[1] The direct appeal opinion reveals that the jury was unable to agree on punishment so the trial court imposed a life sentence. See Mellon, 2007 WL 1319370, at *7.

to him concerning the crime." He confirmed that his sister and Edward Beeler's girlfriend, Ms. Burnae, would have testified that Mr. Beeler was lying. The Petitioner testified that despite his request, trial counsel "never interviewed" these individuals.

The Petitioner claimed that he "never discussed anything with [trial counsel] concerning" her defense strategy at trial. The Petitioner claimed that he did not approve of trial counsel's "fairness consistency argument." The Petitioner said that he recalled discussing the facts of his case with trial counsel but that she never "made [him] copies of anything."

Regarding his not testifying at trial, the Petitioner claimed that he did not decide for himself and that trial counsel "told me it would be best if [he] didn't get on the stand and [he] just went with her advice." He said that the only time he discussed testifying with trial counsel was in the courtroom during his trial. The Petitioner explained, "I didn't tell her I wanted to testify. I just went with her, what she said." In reference to the appeal in his case, the Petitioner stated, "I don't think we discussed anything about it. I think she may have contacted me once or twice through letters, but other than that, I don't remember."

On cross-examination, the Petitioner admitted that he had been involved in the victim's robbery. He further confirmed that he made several statements to the police regarding his involvement in the crime. He said that he was present during the victim's robbery and that David Jones was there. The Petitioner agreed that Anthony Jones was present and shot the victim.

The post-conviction court subsequently denied the petition. In its order denying the Petitioner relief, the post-conviction court found that the Petitioner's trial counsel provided effective assistance. The Petitioner filed a timely notice of appeal.

ANALYSIS

On appeal, the Petitioner argues that the post-conviction court erred in dismissing his petition because he received ineffective assistance of counsel due to trial counsel's failure to present a viable defense. Specifically, he argues that trial counsel failed to provide effective assistance of counsel by (1) "not presenting any proof to bolster her trial strategy of fairness and consistency"; (2) "not calling potential witnesses to testify"; and (3) by failing to put on any proof of "how all the co-defendants were treated within the criminal justice system" and "their coinciding roles in the criminal activity." The State responds that the Petitioner failed to "prove that trial counsel was deficient for failing to assert a viable defense theory" and that the Petitioner failed to "prove that trial counsel was ineffective for failure to put on proof in support of the [d]efense strategy." We agree with the State.

## I. Standard of Review

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

## II. Ineffective Assistance of Counsel

Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

In reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to

reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W. 2d 4, 9 (Tenn. 1982).

At the Petitioner's post-conviction hearing, the court denied his petition and reasoned as follows:

> [T]here has not been evidence presented that would . . . indicate to this [c]ourt that [trial counsel] was in anyway ineffective. She . . . filed a massive number of motions.
>
> This [c]ourt is familiar with [trial counsel's] work. I've been having her in court trying cases for years and years. And she is vigorous and she – she's one of those lawyers who works hard to figure out new angles and to try to find the weakness in the State's case and to try to argue the law whenever it's possible to do so.
>
> With specific reference to the issue about her not talking to these witnesses who reportedly could impeach Mr. Beeler's testimony about the bragging, the [c]ourt would simply note you can't – you can't just say it. You have to . . . show some proof, and there's none here.
>
> . . . .
>
> And beyond that, the [c]ourt would also find that the proof here was so overwhelming that – that no changing by [trial counsel] of what she did could possibly be expected to change the outcome of the trial. The evidence included [the Petitioner's] admission that he was there when this occurred. And the other testimony regarding how the event actually played out, who brought the gun and so forth, would have – , well, it was overwhelming.
>
> . . . .
>
> I see no basis for post-conviction relief and, accordingly, I dismiss the petition.

Here, the post-conviction court clearly credited trial counsel's testimony over that of the Petitioner and concluded that trial counsel's performance was not deficient. Trial

counsel testified that she filed numerous motions on behalf of the Petitioner in preparation for trial, discussed these motions with the Petitioner, and provided the Petitioner with copies. She hired a private investigator and attempted to contact multiple witnesses, although she was unsuccessful in speaking with them. Trial counsel testified that she discussed her defense strategy with the Petitioner and that he did not protest. Further, she stated that she discussed with the Petitioner whether he should testify at trial and advised him that it would be unwise. However, she said that it was ultimately the Petitioner's decision not to testify.

In light of overwhelming evidence presented by the State at trial, trial counsel presented an effective defense strategy of attempting to obtain the least severe sentence possible for the Petitioner. Moreover, she successfully negotiated with the State to drop their pursuit of the death penalty, and during the penalty phase, trial counsel testified that she was able to obtain a sentence of life for the Petitioner's conviction of felony murder. Regarding the Petitioner's argument that trial counsel's performance was deficient, we conclude that the record supports the post-conviction court's conclusion that the Petitioner received effective assistance of counsel.

Additionally, the Petitioner failed to put on any proof that he was prejudiced by counsel's performance. The Petitioner claimed there were potential witnesses who would have testified on his behalf, but he failed to present these witnesses at his post-conviction hearing. In general, the only way a petitioner can establish that trial counsel's failure to interview or present a witness in support of his defense at trial inured to his prejudice is to present the witness at the evidentiary hearing. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Here, the Petitioner failed to present any proof of prejudice; thus, he is not entitled to relief.

## CONCLUSION

Based upon consideration of the foregoing and the record as a whole, the post-conviction court's denial of the petition for post-conviction relief is affirmed.

_____

D. KELLY THOMAS, JR., JUDGE

-10-